THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHESTER HUGHES, Defendant-Appellant.

Second District   No. 2—88—1198

Opinion filed November 9, 1990.

G. Joseph Weller and Sherry R. Engelstad, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan, and Richard L. Salon, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, the defendant, Chester Hughes, was acquitted of aggravated criminal sexual assault and criminal sexual assault but convicted of aggravated battery and sentenced to 30 months' imprisonment. On appeal, he contends that certain trial errors require reversal of the conviction. We disagree and affirm.

The State's first witness, complainant LaTracia Johnson, testified that on the evening of February 9, 1988, she was at the Rolling Greens apartment building in North Chicago, waiting for a ride home. The defendant called to her from his apartment window and struck up a conversation. She asked to use his telephone to call for a ride, and he accordingly let her into the building and accompanied her to his apartment. When she saw that the apartment had apparently been decorated by a woman, she turned to leave, but, according to her testimony, the defendant grabbed her and pulled her back in. She asked him if he had a girlfriend; he replied that he had a wife who was away for a month. According to Johnson, the defendant locked the door, forced her into the bedroom, and insisted that she take off her clothes and have sex with him. Johnson said she did not want to because she had recently had an abortion and her vagina was sore. The defendant then starting poking her in the left leg with a pocket knife until, after the fourth such jab, she felt pain going through her leg. When she realized that he would not stop poking her, she took off her clothes and lay down on the bed. The defendant held her down and hit her to make her perform oral sex, then proceeded to have intercourse with her for about five minutes. Afterwards, they told each other that they would bet money on whether she had gotten pregnant, and they looked unsuccessfully for her gloves. Johnson testified that she left the defendant's apartment and went to the home of her friend, Angela Pharms. When Pharms asked what was wrong with her, Johnson told her that she had walked past a group of boys and that one of them had accidentally stabbed her.

At this point in the testimony, defense counsel, in a conference outside the hearing of the jury, moved *in limine* to prevent the State from eliciting details of what Johnson had told people to whom she reported that she had been raped. The trial judge granted the motion, explaining that, because such details would not be admissible under the spontaneous utterance exception to the hearsay rule, he would let the prosecution allow witnesses to testify that Johnson had reported being raped but would not let the prosecution elicit testimony about

the details of any such reports or conversations. The prosecutor had remarked without objection in his opening statement that the jury would hear evidence that Johnson had told several people that she had been stabbed and raped.

It is not disputed that, after spending the night at Angela Pharms' home, Johnson the next afternoon went to the home of Brenda Williams and was taken by paramedics to St. Therese Medical Center, where she was treated for her stab wound by Dr. Bruce Sands. That evening she visited Carrie Harris, went to the police and spoke with Lieutenant Kaczmaryn, then went again to St. Therese Medical Center, where she was treated by Dr. Thomas Braniff. The next day, February 11, she went back to the police station and talked to Detective Johnnie Phelps about the incident with the defendant.

Johnson testified without objection that she told Carrie Harris that she had been stabbed and raped. On cross-examination she admitted not telling Angela Pharms until after the night of February 9 that she had been raped and stabbed and not telling Brenda Williams, the paramedics, or Dr. Sands that she had been raped and stabbed. She admitted not telling Lieutenant Kaczmaryn that the defendant had stabbed her, and telling Detective Phelps that the defendant had raped her but not that he had stuck her in the leg.

Angela Pharms testified that when she saw Johnson on the evening of February 9 the latter had been crying and was bleeding from an open cut on her left leg. Carrie Harris testified without objection that Johnson told her of being raped and stabbed, but only after she had told Harris that she hurt her leg when she fell. Dr. Sands testified without objection that Johnson had told him that she had been stabbed, but not that she had been raped.

Detective Johnnie Phelps testified that on the morning of March 7, 1988, the defendant and his mother walked into the North Chicago police station. Phelps served a copy of an arrest warrant on defendant, took him to the interview room, and read him his rights. After the defendant signed a waiver of rights, Phelps told him about Johnson's report to the police, and the defendant acknowledged letting Johnson into his apartment and conversing with her. The defendant admitted stabbing Johnson in the leg with a knife a couple of times after which both he and Johnson took off their clothes, had sexual intercourse, got dressed, and looked for her gloves. The defendant denied to Phelps that he had forced her back into the apartment or attempted to have oral sex with her, but admitted telling her that he would bet $50 that she was not pregnant. After listening to the defendant, Phelps wrote up a statement which was later admitted

into evidence.

After the trial court denied defendant's motion for a directed verdict, the defense put on its case. Brenda Williams testified on direct examination that Johnson told her that she had been stabbed by one of three boys she passed on the street. David Biggs, one of the paramedics who took Johnson to the hospital, testified that Johnson told the paramedics that her stab wound was an accident that resulted from playing with a knife with a girlfriend and that she never told them that she had been raped. He stated on cross-examination, without objection, that the paramedics were surprised when they heard her tell the doctors that she had been raped. Dr. Braniff testified that Johnson had told him that she had been stabbed and raped.

The defendant took the witness stand and testified that Johnson had been in his apartment for about 45 minutes before they had sex and had not told the defendant anything about an abortion. According to the defendant, "one thing led to another," and the two went into the bedroom, removed their clothing, and had sexual intercourse. The defendant denied having a knife or stabbing Johnson. He stated that he did not slap her, or attempt oral sex, and that neither of them bet on whether she was pregnant or looked for her gloves.

The defendant testified that he went to the police station with his mother on March 7, after she had telephoned him with news that there was a warrant out for his arrest. At the station, the defendant met Phelps and, in the interview room, signed a waiver of rights and talked about the incident with Johnson. The defendant testified that after he finished Phelps told him that Johnson had told Phelps that the defendant had a knife; the defendant at first denied this but, intimidated by Phelps' reputation and by his cursing and calling the defendant a liar, got nervous and told Phelps that he had had a knife.

At the close of the evidence, the defendant moved for a directed verdict on all charges. The next day, at a conference with counsel, the trial judge denied the motion and, on his own initiative, informed counsel that according to the hearsay rules he had been mistaken to allow any testimony that LaTracia Johnson had told others that she had been raped. On the judge's request, the prosecutor drafted a curative instruction, later given to the jury, which told the jury not to consider in any way the testimony regarding LaTracia's complaint of rape to several witnesses. Defense counsel stated that the draft instruction was inadequate because it did not specifically tell the jury that the testimony was unreliable. Defense counsel did not tender an alternative instruction and expressly declined the trial judge's suggestion to move for a mistrial. When the trial judge then indicated that

he would give the curative instruction, defense counsel made no response.

The jury returned, counsel delivered closing arguments, and the trial judge read the curative instruction along with the other instructions. The jury acquitted the defendant of the two sexual assault charges and convicted him of aggravated battery. The trial court subsequently sentenced the defendant to 30 months' imprisonment and denied his motion for a new trial or for a judgment *n.o.v.*

The defendant contends first that he was denied a fair trial when a uniformed Lake County sheriff escorted him to the witness stand, stood behind him as he testified, and escorted him back to the defense table afterward. The defense claims that, according to *Holbrook v. Flynn* (1986), 475 U.S. 560, 89 L. Ed. 2d 525, 106 S. Ct. 1340, such "guarding" of the defendant attenuated the presumption of innocence and created a constitutionally unacceptable risk that factors not in evidence would lead the jury to find him guilty.

The sole reference in the record to the presence of the officer is contained in the following exchange between defense counsel and the trial judge, which took place after the conclusion of the defendant's testimony:

"MS. GROHS [Defense Counsel]: I want this for the record, that when the defendant walked up to testify, he was escorted by a Lake County Sheriff, who stood behind him while testifying, and then escorted him back to the seat.

THE COURT: Not in any, any, well, unusual way."

The defendant did not complain about the presence of the sheriff before or during his testimony, did not clearly object afterward, and did not renew the matter in any way thereafter until this appeal. Acknowledging that this issue was waived at the trial level, he asks us to find that the presence of the officer constituted plain error (107 Ill. 2d R. 615(a)). We find no error.

■ In *Holbrook v. Flynn*, the Supreme Court refused to hold that the defendant was denied a fair trial by the presence, at his trial with five codefendants, of four uniformed State troopers sitting in the first row of the spectator section of the courtroom. The court held that the presence of security personnel in a courtroom during a trial, unlike the shackling of a defendant, is not the sort of inherently prejudicial practice that should be permitted only where justified by an essential State interest specific to each trial. The Court explained that a jury would not necessarily infer from the officers' presence that the defendant was particularly dangerous or culpable but might as easily assume that the officers were there out of a normal concern for court-

room order or simply infer nothing at all. Even a slight degree of prejudice could be justified by the State's need to insure the presence at trial of defendants who had been denied bail. The Court therefore held that the defendant in each case has the burden to show actual prejudice.

■ Applying these principles, we hold that the bare fact that the defendant was escorted to and from the witness stand and "guarded" during his testimony by a security officer is inadequate to demonstrate any prejudice, much less plain error, particularly as the trial judge did not find the procedure unusual and the defendant's recognizance bond had been revoked after his numerous unauthorized absences from pretrial bond supervision. It is not material that the officer was positioned near the defendant rather than in the spectator section (*People v. Glasco* (1966), 66 Ill. App. 2d 445, 448-49) or that he stood at an unspecified distance behind the defendant as the latter testified (*United States v. Williams* (8th Cir. 1990), 897 F.2d 1430, 1434).

■ The defendant contends secondly that the trial court's instruction on the complainant's reports of rape did not cure the unfair prejudice to him from the admission of this evidence. He argues that as all such statements were inadmissible hearsay, not within the exception for spontaneous declarations, the curative instruction was inadequate because it referred only to rape and therefore allowed the jury to consider testimony that LaTracia Johnson told others that she had been stabbed.

Defense counsel did not object to references in the prosecutor's opening statement to such testimony and objected at trial only to attempts to elicit details of LaTracia Johnson's reports of being raped or stabbed. The trial judge issued the curative instruction entirely on his own initiative. Defense counsel declined to offer an alternative instruction, move for a mistrial, formally object, or call the trial judge's attention to the particular weakness that the defendant now alleges. Any error in the instruction has been waived. *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180-81.

The trial court's judgment is affirmed.

Affirmed.

DUNN and WOODWARD, JJ., concur.