[No. S158852. Nov. 5, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
LORENZO STEVENS, Defendant and Appellant.

**COUNSEL**

Alan Charles Dell'Ario, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Rene A. Chacon, Stan Helfman, Laurence K. Sullivan and Arthur P. Beever, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—We hold here that the stationing of a courtroom deputy next to a testifying defendant is not an inherently prejudicial practice that must be justified by a showing of manifest need. Defendant Lorenzo Stevens attempts to bring his case under the exacting manifest need standard by asserting that the deputy's presence is akin to a "human shackle." A divided Court of Appeal rejected this argument, and we do so as well. This conclusion is consistent with our explicit and unanimous holding in *People v. Marks* (2003) 31 Cal.4th 197, 222–224 [2 Cal.Rptr.3d 252, 72 P.3d 1222] (*Marks*). Because defendant has not shown actual prejudice, and the record supports the trial court's exercise of discretion, we affirm the judgment of the Court of Appeal.

## BACKGROUND

On July 13, 2004, 14-year-old R.D. was riding the bus home when defendant, her father, called her cellular phone. R.D. lived with her grandmother and had not seen her father in a month or two. At defendant's request, R.D. met him at a nearby Taco Bell. From there, they walked about 30 minutes to an alley. Defendant said he was living in a truck, which appeared to have been parked in the alley for a long time. The windshield was covered with dirt, and the windows were obscured with hanging pieces of cloth. They talked about why defendant was living in a truck, and defendant asked R.D. if she would help him make money. He said he wanted to take her to a hotel, and R.D. believed he was suggesting prostitution. Defendant told R.D. she should use a more exotic, grownup name at the hotel. He told her to say her name was "Joy." Defendant asked R.D. if she was sexually active with her boyfriend, and he looked through her purse for condoms.

While they sat inside the truck, defendant smoked something he called "crystal" from a glass pipe. He then lay back and told R.D. to take off her pants. When she refused, defendant placed a small rock of the "crystal" in her mouth, telling her to suck on it and relax. The rock made R.D.'s tongue numb. While defendant's eyes were closed, she took the rock out of her mouth and placed it in her bra. Defendant later asked for the rock back, but R.D., to his substantial annoyance, claimed she had swallowed it. Defendant pulled his daughter onto his lap and told her to dance. As she sat there, she felt his pelvis moving against her bottom. She told him she wanted to leave, but defendant would not release her. She began to cry and scream. Defendant continued to hold her down and then sucked the side of her neck. He threatened to hit her if she did not quiet down. Then he pulled his pants down, pulled R.D.'s head toward his penis, and told her to orally copulate him.

R.D. managed to escape and took the bus to her grandmother's house. While on the bus, she took the rock out of her bra and put it in her purse. Once home, R.D. called her mother, then told her grandmother what had happened. The grandmother, Alice Beal, noticed a red mark on R.D.'s neck that she had not seen earlier that morning. R.D. gave the rock to Beal, who placed it in a plastic bag and called the police.

Officer Valerga of the Oakland Police Department responded and took possession of the bag containing the "crystal" rock, which was later determined to be cocaine base. The officer asked to see where the incident occurred and then drove R.D. and her grandmother to the Taco Bell. While she was in the squad car, Beal received a call from R.D.'s mother, who reported that she had seen defendant and that her brother (R.D.'s uncle) was chasing him. Officer Valerga went to the mother's location and called for backup.

Several officers chased defendant through backyards. Eventually, he jumped onto the roof of a house. As approximately 10 to 15 officers surrounded the house and began to establish a perimeter, defendant took a running leap onto another rooftop. He paced continually, looking over the edges of the roof. During an hour-long standoff with the officers, defendant was agitated and threatened suicide. He said he was upset about the sexual way his friends had been looking at his daughter. He said that, although nobody would believe him, he did not touch her. When one officer urged defendant to come down, he refused, saying, "They're going to look at me differently." At one point, defendant sat and smoked what appeared to be crack cocaine from a glass pipe. While on the roof, he began interacting with the crowd of spectators that had gathered.

Officers found a ladder in the yard and leaned it against the house. However, to the great amusement of the crowd, defendant pulled the ladder onto the roof, leaving the officers on the ground. Eventually, Oakland Fire Department personnel arrived with a ladder. When officers began climbing to the roof, defendant jumped off the opposite side. He was taken into custody on the ground and later transported to a hospital for a sexual assault exam. He was combative and uncooperative at the hospital and had to be placed in restraints.

Defendant was charged with assault with intent to commit rape, sodomy, or oral copulation; furnishing a controlled substance to a minor; and administering a drug to aid in the commission of a felony. The information also alleged defendant had a prior serious felony conviction. Early in the trial, the court

was informed that defendant was trying to convince R.D. and her mother to drop the charges. While in custody, he had arranged for a woman to call on his behalf and convey this request. The court said for the record that it considered this conduct to be an implied threat.

Defendant testified that he called R.D. on July 13, 2004, because he was concerned about rumors he had heard about her grades and bad behavior and because he was considering moving away. As they walked to the truck where he was living, defendant said he noticed a "hickey" on R.D.'s neck. When they were sitting in the truck, he confronted her about the hickey and asked if she was sexually active or using drugs. Defendant claimed R.D. began crying during this conversation and told him she had been raped. After she stopped crying, defendant walked her to the bus stop. Defendant saw her off, then retrieved some supplies and began washing someone's car. As he did so, a friend approached and warned him that R.D. had reported a sexual assault. Distressed, defendant called his sister, asking her to come and talk to him. When she arrived, R.D.'s mother and a man jumped out of the car and began an attack that included beating him with a stick. Defendant ran. He continued running even after he saw the police because he was afraid. Defendant admitted that he smoked crack cocaine while he was on the roof.

Defendant attended his trial unshackled and wearing civilian clothing. During R.D.'s testimony, a support person sat next to her and, without defense objection, was introduced as a "victim witness advocate." (See Pen. Code, § 868.5.) A sheriff's deputy sat directly behind defendant throughout the trial, and a uniformed deputy[1] was stationed at the witness stand while defendant testified.

Before defendant took the stand, his attorney stated that he had been informed by the court and by courtroom deputies that if his client testified, "it is policy—I'm not sure whose policy, but it is policy to have a deputy sit with him at the witness stand while my client testifies." Counsel objected to this procedure, arguing the placement of a deputy at the witness stand "is, basically, a human shackle" that must be justified by good cause. In response, the court observed that a deputy had been "sitting right behind" defendant "throughout the entire trial," and the court reasoned, "Having a deputy in, basically, the same proximity . . . will be no more prejudicial." The court remarked that "the Alameda County Sheriff's Department policy of having a

---

[1] Despite the Court of Appeal's description of the deputy as an "armed guard," the record includes no evidence about whether the deputy was armed. Thus, although we granted the Attorney General's request for judicial notice of sheriff's department regulations forbidding deputies to wear firearms "in close proximity to inmates" (see Evid. Code, § 452, subd. (b)), we draw no conclusion about whether a firearm was worn in this particular case.

deputy at the stand with an in-custody [defendant] for safety purposes, or even to prevent escape, is certainly reasonable," and stated it did not want jurors to be distracted by safety concerns. The prosecutor added that defendant had become outwardly agitated in the presence of other deputies. One of the jurors had submitted a note that remarked on defendant's agitated behavior and apparent irritability. After defendant testified, his attorney stated for the record that a uniformed deputy sheriff was "up on the stand next to him" during both days of his testimony. Counsel also observed that the juror's note stated only that he found defendant's behavior "distracting." In a second note, the juror said he did not feel afraid of defendant.[2]

Defendant was convicted as charged and sentenced to prison. A divided panel of the Court of Appeal affirmed his conviction. We granted review to determine whether the placing of a deputy sheriff at the witness stand while defendant testified was an abuse of discretion or required a specific showing of need. Defendant claims this procedure violated his right to due process under the Fifth and Fourteenth Amendments of the United States Constitution. He also argues the trial court abused its discretion by deferring to a sheriff's department policy instead of reaching its own determination about security needs.

## DISCUSSION

We begin with the familiar principle that a "trial court has broad power to maintain courtroom security and orderly proceedings. [Citations.]" (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645].) For this reason, decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion. (*Ibid.*; *People v. Ayala* (2000) 23 Cal.4th 225, 253 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Duran* (1976) 16 Cal.3d 282, 293, fn. 12 [127 Cal.Rptr. 618, 545 P.2d 1322] (*Duran*).)

However, despite our traditional deference to the trial court in this area, some extraordinary security practices carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial. These exceptional practices must be justified by a particularized showing of manifest need sufficient to overcome the substantial risk of prejudice they pose. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. (*Deck v. Missouri* (2005) 544 U.S. 622, 630 [161 L.Ed.2d 953, 125 S.Ct. 2007]; see *Duran, supra,* 16 Cal.3d at p. 290.) The same problem arises if the defendant

---

[2] Neither note appears in the appellate record.

is required to appear before the jury dressed in prison clothing. (*People v. Taylor* (1982) 31 Cal.3d 488, 494–495 [183 Cal.Rptr. 64, 645 P.2d 115]; *Estelle v. Williams* (1976) 425 U.S. 501, 504–505 [48 L.Ed.2d 126, 96 S.Ct. 1691].) In addition to their prejudicial effect on the jury, shackles may distract or embarrass a defendant, potentially impairing his ability to participate in his defense or serve as a competent witness on his own behalf. (*Deck v. Missouri*, at p. 630; *Duran*, at pp. 288–290; *People v. Harrington* (1871) 42 Cal. 165, 168.) Similar concerns have been raised about the use of physical restraints not visible to the jury, like stun belts. (*People v. Mar* (2002) 28 Cal.4th 1201, 1218–1220 [124 Cal.Rptr.2d 161, 52 P.3d 95].)

Because physical restraints carry such risks, the United States Supreme Court has long considered their use inherently prejudicial. (*Deck v. Missouri*, *supra*, 544 U.S. at pp. 626–629; *Illinois v. Allen* (1970) 397 U.S. 337, 343–344 [25 L.Ed.2d 353, 90 S.Ct. 1057]; see *Holbrook v. Flynn* (1986) 475 U.S. 560, 568–569 [89 L.Ed.2d 525, 106 S.Ct. 1340] (*Holbrook*).) Thus, a criminal defendant may not appear before the jury in shackles unless the trial court has found that the restraints are justified by a state interest specific to the particular trial. (*Deck v. Missouri*, at pp. 629, 632.) The court's determination may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." (*Id.* at p. 629.)

For similar reasons, we too have concluded that visible physical restraints must survive heightened scrutiny and be justified by a particular need. In *Duran*, *supra*, 16 Cal.3d at pages 290–291, we held that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." While the court retains discretion to order restraints when they are needed to protect against courtroom violence or other disruptions, we cautioned that imposing visible physical restraints without a record showing violence, a threat of violence, or other nonconforming conduct, "will be deemed to constitute an abuse of discretion." (*Id.* at p. 291.) No formal hearing is necessary to fulfill the mandate of *Duran*; however, the record must show the court based its determination on facts, not rumor and innuendo. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1032 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Cox* (1991) 53 Cal.3d 618, 651–652 [280 Cal.Rptr. 692, 809 P.2d 351]; see also *People v. Hayes*, *supra*, 21 Cal.4th at p. 1268.)

■ But the stringent showing required for physical restraints like shackles is the exception, not the rule. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need.

(*People v. Jenkins* (2000) 22 Cal.4th 900, 995, 997 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *Duran, supra,* 16 Cal.3d at p. 291, fn. 8.) In contrast to physical restraints placed on the defendant's person, we have upheld most other security practices when based on proper exercises of discretion. Thus, we concluded the use of a metal detector or magnetometer at the entrance of the courtroom is not inherently prejudicial. (*People v. Jenkins,* at p. 996; *People v. Ayala, supra,* 23 Cal.4th at pp. 252–253; see also *Morgan v. Aispuro* (9th Cir. 1991) 946 F.2d 1462, 1465 [use of a "security courtroom," with a partition and bars separating spectator section from court area, is not inherently prejudicial].) And we have consistently upheld the stationing of security or law enforcement officers in the courtroom. (E.g., *People v. Jenkins,* at pp. 998–999; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1003–1004 [248 Cal.Rptr. 568, 755 P.2d 1017]; see *People v. Miranda* (1987) 44 Cal.3d 57, 114–115 [241 Cal.Rptr. 594, 744 P.2d 1127] [three officers accompanied a prosecution witness who was in custody].)

In *Duran,* we specifically distinguished shackling from the use of armed guards in the courtroom. (*Duran, supra,* 16 Cal.3d at p. 291, fn. 8.) We explained that unless the guards "are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor. [Citations.]" (*Ibid.*) California courts have long maintained this distinction between the presence of security officers and the imposition of physical restraints. In *People v. David* (1939) 12 Cal.2d 639, 644 [86 P.2d 811], after a sheriff and his deputies accompanied the defendant into the courtroom, one deputy followed the defendant inside the rail and took a seat immediately behind him. The defendant claimed this action biased the jury in the same manner as shackling, but we disagreed, finding "nothing to show that [the deputy's] conduct prejudiced the defendant in any way." (*Ibid.*) In *People v. Stabler* (1962) 202 Cal.App.2d 862, 863 [21 Cal.Rptr. 120], a defendant with a history of escaping from prison relied on shackling authorities in objecting to the presence of eight armed law enforcement officers in the courtroom. The Court of Appeal rejected his claim, noting the defendant "was under no close or obvious personal restraint in the presence of the jury." (*Id.* at p. 864.) The court observed, "Mere increase in the number of guards was by no means unreasonable in view of the indications that defendant sought to become the Houdini of Humboldt." (*Ibid.*) In *People v. Ainsworth, supra,* 45 Cal.3d at page 1003, the defendant objected to the presence of four to six uniformed, armed sheriff's deputies, including two posted behind him. He claimed their number and placement were unconstitutional without a particularized showing of manifest need. We upheld the stationing of these deputies as a reasonable exercise of the trial court's discretion. (*Id.* at pp. 1003–1004.)

When the United States Supreme Court addressed a claim challenging the presence of armed guards in the courtroom, it explained in detail why the

deployment of security personnel is different from shackling and usually does not constitute an inherently prejudicial practice that must be justified under a higher standard of scrutiny. Writing for a unanimous court, Justice Marshall stated: "The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citation.]" (*Holbrook, supra,* 475 U.S. at p. 569.) The court cautioned that the sight of a security force might, under some conditions, create an impression in jurors' minds that the defendant is dangerous or untrustworthy; "[h]owever, 'reason, principle, and common human experience,' [citation] counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." (*Ibid.*)

Indisputably, events in recent years have resulted in security guards becoming even more ubiquitous than when Justice Marshall made his observations in 1986. As the Chief Justice of this court pointed out in *People v. Jenkins, supra,* 22 Cal.4th at page 998, the presence of security guards in the courtroom "is seen by jurors as ordinary and expected." Following the high court's holding that the stationing of identifiable security officers in the courtroom is not inherently prejudicial, we have examined claims of excessive security to determine whether the defendant was actually prejudiced by the officers' presence. (*Ibid.; People v. Miranda, supra,* 44 Cal.3d at p. 115.) Defendant has not cited, nor, after a nationwide search, have we found, a single conviction that has been reversed under *Holbrook* based on the presence of excessive security in the courtroom.[3]

---

[3] The only case that comes close is *Woods v. Dugger* (11th Cir. 1991) 923 F.2d 1454, but it is readily distinguishable. In *Woods,* the defendant was tried for killing a corrections officer in a small Florida community with close ties to the prison. (*Id.* at pp. 1457–1458.) A large number of corrections officers, filling as much as half the courtroom, attended the trial in uniform. (*Id.* at p. 1458.) The Eleventh Circuit Court of Appeals reversed the defendant's conviction due to the prejudice that may have resulted from the combination of extensive

The issue presented here is only slightly different. Defendant's objection rests not on numbers but on propinquity. He asserts he was deprived of a fair trial because one deputy sat or stood next to him at the witness stand while he testified.[4] Analogizing to the physical restraint cases, he characterizes the deputy as a "human shackle," whose presence nearby focused attention on his custodial status as do physical restraints or jailhouse clothing. Thus, he contends the deputy's presence should be considered inherently prejudicial. We disagree.

We considered a very similar claim in *Marks, supra,* 31 Cal.4th at pages 222–224. The trial court in *Marks* initially declined to impose physical restraints requested by the defendant's own attorneys due to his violent outbursts. It revisited the issue upon learning that the defendant intended to testify. The witness stand was located only four feet from the jury box. (*Id.* at pp. 222–223.) As an alternative to having the defendant testify from his position at counsel's table, the trial court allowed the defendant to take the witness stand but "position[ed] a marshal in a chair next to defendant on the raised platform that was parallel to Juror No. 7." (*Id.* at p. 223.) It appeared from the record that "the marshal sat four or five feet from defendant's side (facing his ear) next to and slightly behind Juror No. 7." (*Id.* at p. 223, fn. 5.)[5] At the defendant's request, the court admonished the jury not to

---

pretrial publicity and the imposing presence at trial of so many uniformed guards. (*Id.* at pp. 1459–1460; but see *Bell v. True* (W.D.Va. 2006) 413 F.Supp.2d 657, 721 [pretrial publicity combined with the presence of uniformed officers in the courtroom did not pose unacceptable threat to defendant's right to a fair trial].) In *Woods,* unlike here, the officers were present only as spectators "and . . . were not part of the courtroom security." (*Woods v. Dugger,* at p. 1460.)

[4] Although it is not clear from the record, the deputy also presumably walked to the witness stand with defendant, because defendant was called to testify immediately after another witness stepped down. However, as the Attorney General pointed out at oral argument, it is possible that a deputy deployed elsewhere in the courtroom simply moved to the vicinity of the witness box. The record does not say. Nor does anything in the record establish whether the deputy sat or stood, or precisely where he was in relation to defendant. All we have is defense counsel's statement that the deputy was "up on the stand next to" defendant. Neither this statement nor anything else in the record supports the dissent's assertion that the deputy sat "in the jury's view" and "right next to" defendant (dis. opn., *post,* at p. 649), such that "the jury . . . could not help but see the deputy sheriff while watching defendant testify" (*id.* at p. 650, fn. 9).

[5] The dissent makes an unfounded, and erroneous, assumption when it tries to distinguish *Marks* based on where the marshal was seated. (Dis. opn., *post,* at p. 650.) There is no basis in *Marks* from which to assert that the marshal there was any more removed from the jury's sight line than the marshal here. These cases were tried in the same Alameda County courthouse. In *Marks,* the court said it would have a marshal seated "in a chair next to defendant on the raised platform" adjacent to the jury box. (*Marks, supra,* 31 Cal.4th at p. 223.) The jury box was four feet away from the witness stand and on the same level with it. (*Ibid.*) In *Marks,* as here, the deputy was "up on the stand next to" the defendant. *Marks* cannot legitimately be distinguished on the basis urged. Thus, unlike the apparent confusion of the dissent, we understand the description by the trial court in *Marks* of a marshal sitting "next

speculate about the reasons for the deputy's position. (31 Cal.4th at p. 223.) On appeal, this court unanimously rejected the defendant's claim that a showing of manifest need was required to justify the deputy's presence "so close to him as he testified." (*Ibid.*) We found the defendant's reliance on *Duran* unavailing because *Duran* required a manifest need showing only for the use of physical restraints, and it "expressly distinguished such shackling from monitoring by security personnel." (*Marks*, at p. 223.) We observed that the distinction between shackling and the stationing of security officers has long been recognized in California law, and we found support for this view in the Supreme Court's *Holbrook* decision. We expressly adhered to the distinction and declined to require a showing of manifest need for the deployment of marshals inside the courtroom. (*Marks*, at p. 224.) In light of Mr. Marks's history of violence and disruptive behavior during the proceedings, we concluded the trial court had properly exercised its discretion in stationing a deputy near the witness stand. (*Ibid.*)

Defendant's attempt to distinguish *Marks* is unpersuasive. Defendant argues our rejection of the manifest need requirement should be disregarded as dicta because the record of Mr. Marks's violent behavior was sufficient to meet the heightened standard. However, *Marks* did not rely on the defendant's conduct or the courtroom's configuration to conclude that the manifest need standard was satisfied in that particular case. *Marks* held that the higher showing of manifest need was *not required*. (*Marks*, *supra*, 31 Cal.4th at p. 224.) Of course, even where a showing of manifest need is not required to justify a security practice, the practice remains subject to review for abuse of discretion. (See, e.g., *People v. Jenkins*, *supra*, 22 Cal.4th at pp. 998–999; *People v. Miranda*, *supra*, 44 Cal.3d at p. 115.) Although we suggested the result would be the same in *Marks* "[u]nder any standard of review," our discussion of facts supporting the trial court's decision was merely an application of this deferential review. (*Marks*, at p. 224.)

█ The dissent below cited the factual discussion in *Marks* as "just the type of case-by-case approach deemed 'appropriate' by the United States Supreme Court in *Holbrook*, *supra*, 475 U.S. at page 569." The dissent misreads *Holbrook* and ignores the express holding of *Marks*. These cases do not turn on individualized trial court determinations, but on whether the security practice is so inherently prejudicial that it must be subject to stricter scrutiny. Any discretionary ruling must take into account the particular circumstances of the individual case and will be reviewed in that context. However, if a practice is not inherently prejudicial, it need not be justified by a compelling case-specific showing of need. (*Holbrook*, at pp. 568–569; *People v. Jenkins*, *supra*, 22 Cal.4th at p. 997.) As the high court explained in

---

to defendant" to mean that there the marshal was sitting *next to the defendant*. The marshal would have been between the defendant and the jurors and, therefore, in their line of sight.

the context of habeas corpus review, "All a federal [or a reviewing] court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." (*Holbrook*, at p. 572.)

■ The practice at issue here was very similar to that in *Marks*. A deputy sheriff was stationed at the witness stand near defendant throughout his testimony. In deciding whether this arrangement was inherently prejudicial, we must evaluate the likely effects of the procedure "based on reason, principle, and common human experience" (*Estelle v. Williams, supra*, 425 U.S. at p. 504) to determine "whether 'an unacceptable risk is presented of impermissible factors coming into play.' " (*Holbrook, supra*, 475 U.S. at p. 570.)

Defendant argues a uniformed deputy's presence at the witness stand converts a neutral security measure into one that is impermissibly defendant focused. He contends the deputy serves as a constant reminder of the defendant's custodial status, like prison clothing or visible physical restraints, thus implying that the defendant is dangerous or untrustworthy. (See *Holbrook, supra*, 475 U.S. at p. 569.)

■ We conclude a deputy's presence at the witness stand during a defendant's testimony is not inherently prejudicial. As the United States Supreme Court observed over 20 years ago, jurors have become accustomed to seeing security officers in public places such as the courtroom (*Holbrook, supra*, 475 U.S. at p. 569), and there is a wide range of inferences they may draw from an officer's presence near a testifying defendant. Because security officers are now "ordinary and expected" in the courtroom (*People v. Jenkins, supra*, 22 Cal.4th at p. 998), jurors may view the sight of an officer accompanying the defendant to the witness stand as nothing more than a routine measure. (*Holbrook*, at p. 569; see *People v. Miranda, supra*, 44 Cal.3d at p. 115.) Although a deputy's presence next to a testifying defendant may be viewed as a defendant-focused practice when officers do not accompany other witnesses to the stand, the Supreme Court has made it clear that not "every practice tending to single out the accused from everyone else in the courtroom must be struck down." (*Holbrook, supra*, 475 U.S. at p. 567.) "Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance," the high court stressed that it has "never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct." (*Ibid.*) That a security practice seems to focus attention on the defendant is not enough, without more, to render the practice inherently prejudicial.

■ Defendant's attempt to characterize the deputy's presence at the witness stand as a "constant reminder" of his custodial status also fails to withstand scrutiny. The United States Supreme Court has previously approved the posting of uniformed, armed troopers immediately behind defendants sitting at counsel table. (*Holbrook, supra,* 475 U.S. at pp. 562–563 & fn. 2.) This accepted practice is not transformed into an inherently prejudicial measure simply because an officer rises with the defendant and maintains the same proximity to him while he testifies. The jury will see the security officer at the stand for a limited period of time. Thus, the officer's presence at the stand is not "a continuing influence throughout the trial" (*Estelle v. Williams, supra,* 425 U.S. at p. 505) in the same way as the constant sight of prison clothes or shackles. Defendant also asserts that a deputy's presence near the accused will "inevitably tend[] to confuse and embarrass his mental faculties." (*People v. Harrington, supra,* 42 Cal. at p. 168.) He does not explain why the mere proximity of a law enforcement officer will "inevitably" produce such a crippling mental state. In the shackling context, we have recognized the potential for distraction and embarrassment that might flow from the pain or restriction imposed by *physical bonds.* (*Ibid.; Duran, supra,* 16 Cal.3d at p. 288.) Similarly, in *People v. Mar, supra,* 28 Cal.4th at pages 1226–1227, we noted the psychological effects of wearing a device that can deliver a severe electrical shock without warning, and even through inadvertence. There is simply no equivalent here to the extreme and sometimes painful physical limitations imposed by manacles or other physical restraining devices. The presence of a deputy does not directly impair the accused's mobility, nor does it create the affront to human dignity that we have lamented in the context of visible shackles. (*Duran,* at p. 290; see also *Deck v. Missouri, supra,* 544 U.S. at pp. 631–632.) On the contrary, so long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony,[6] a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings.

The Supreme Court of Illinois previously announced the same conclusion we reach here. In *People v. Peeples* (2002) 205 Ill.2d 480, 526 [275 Ill.Dec. 870, 793 N.E.2d 641, 669], two uniformed deputy sheriffs sat within arm's reach behind the defendant while he was seated at the defense table. When, in the presence of the jury, the defendant was called to testify, one of the deputies " 'escorted him to the witness stand, stood behind him while he testified, and then escorted him back to the defense table.' " (*Ibid.*) On appeal, the defendant claimed this practice was inherently prejudicial because it could raise no inference other than that he was a dangerous person who

---

[6] Defendant does not claim the deputy's demeanor here was in any way inappropriate.

was likely guilty of the crime charged. (*Id.*, 793 N.E.2d at p. 671.) Illinois's high court disagreed, citing the prior approval of a variety of courtroom security configurations. (*Id.* at pp. 671–672.) Noting that the presence of uniformed guards during courtroom proceedings is a common practice, the court found nothing extraordinary about the posting of a single guard behind the defendant at the witness stand. (*Id.* at p. 672.) Because "there [wa]s no evidence of record that the number of guards or their weaponry 'suggest[ed] particular official concern or alarm' (*Holbrook*, [*supra*,] 475 U.S. at 569 . . .)," the court concluded, "any inferences unfavorable to defendant under the circumstances at bar would be highly speculative." (*People v. Peeples*, at p. 672; see also *U.S. v. Williams* (8th Cir. 1990) 897 F.2d 1430, 1434 [defendant was not prejudiced by presence of uniformed United States marshal standing next to him at the witness stand]; *People v. Hughes* (1990) 205 Ill.App.3d 79, 83–84 [150 Ill.Dec. 463, 562 N.E.2d 1266, 1269] [no error resulted when uniformed sheriff escorted defendant to witness stand, stood behind him as he testified, and escorted him back to the defense table afterward]; *Wainwright v. Lockhart* (8th Cir. 1996) 80 F.3d 1226, 1232 [it was not inherently or actually prejudicial for capital defendant to be escorted and guarded by two officers at the witness stand during the penalty phase of trial]; cf. *Hunt v. State* (1988) 312 Md. 494, 506–508 [540 A.2d 1125, 1130–1132] [no prejudice shown from correctional officers accompanying defendant to bench conferences during pretrial voir dire proceedings].)[7]

The circumstances of this case do not support defendant's claims of prejudice, inherent or otherwise. Although defendant argues the jury may have viewed him as dangerous, this possibility is undercut by the fact that he was monitored by a single deputy. Indeed, given the undisputed evidence that defendant was physically attacked by members of the victim's family when

---

[7] As noted, we have not found a decision from anywhere in the country reaching the opposite conclusion. Defendant has directed us to two out-of-state cases, but neither involves a claim of prejudicial security measures or the stationing of a security officer at the witness stand. In the pre-*Holbrook* case *Anthony v. State* (Alaska 1974) 521 P.2d 486, the Alaska Supreme Court reversed a murder conviction due to instructional error. Near the end of its opinion, the court related an incident in which the defendant had been brought into court unshaven, under guard, and possibly wearing jail clothing. (*Id.* at p. 495.) Without deciding whether this was prejudicial error, the court cautioned that on remand the defendant should be permitted to appear in court shaved and showered, and in his own attire, and "guards should remain outside the observation of the jury." (*Id.* at p. 496.) In *State v. Gonzalez* (2005) 129 Wn.App. 895 [120 P.3d 645], a divided appellate panel reversed a criminal conviction because comments from the trial court inappropriately highlighted the defendant's custodial status. The court had announced at the outset of trial that the defendant "could not post bail, was therefore being held in jail, was being transported to and from court in handcuffs, and that uniformed officers were guarding him in the courtroom." (*Id.*, 120 P.3d at p. 647.) Although the jury was told to draw no adverse inferences from these facts, the majority believed a preemptive instruction that draws attention to a defendant's custodial status "creates the problem it purports to solve." (*Id.* at p. 649.)

they learned of the alleged assault, jurors might reasonably have concluded that the deputy was present to protect defendant's own safety. Or, if they thought anything of the deputy's presence at all, jurors may have believed it to be a routine precaution. Further, the jury was properly instructed to disregard the fact that defendant was in custody.[8] We presume the jury followed this instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

■ Defendant also claims he was prejudiced by the contrast between his law enforcement escort and his accuser's accompaniment by a person the prosecutor described as a "victim witness advocate." Penal Code section 868.5, subdivision (a) entitles the prosecuting witness in a sex abuse case to have a support person present at the stand during the witness's testimony. Defendant did not object to the support person's presence at trial, and he therefore waived any claim of error from this procedure. (*People v. Lord* (1994) 30 Cal.App.4th 1718, 1722 [36 Cal.Rptr.2d 453].) Moreover, defendant offers no facts about the demeanor of the support person or the deputy to support his claim of prejudice. "The presence of a second person at the stand does not require the jury to infer that the support person believes and endorses the witness's testimony, so it does not *necessarily* bolster the witness's testimony." (*People v. Adams* (1993) 19 Cal.App.4th 412, 437 [23 Cal.Rptr.2d 512].) In fact, the jury need not have drawn the negative contrast defendant posits. Unfamiliar with courtroom protocol, jurors may have believed it is standard procedure for both defendants and their alleged victims to be accompanied when they testify. Here, the jury saw that the two most important witnesses in the case were both joined by another individual. Rather than heightening the prejudice possible from the deputy's presence, this circumstance may have made the practice seem all the more routine. Nor are we persuaded that the stationing of the deputy was especially prejudicial in this case because the evidence consisted primarily of the conflicting accounts of the incident given by defendant and his daughter. In nearly every case when an accused testifies in his own defense, the jury will have to weigh the credibility of the defendant and the alleged victim.

Finally, defendant argues the trial court abused its discretion by deferring to a sheriff's department policy rather than reaching its own conclusion about whether to post a deputy at the witness stand. In the shackling context, we have explained that it is the function of the trial court, not the prosecutor or law enforcement personnel, to determine whether manifest need supports the

---

[8] The jury was instructed with a variation of CALJIC No. 1.04, as follows: "The fact that the Defendant is in custody must not be considered by you for any purpose. That is not evidence of guilt and must not be considered by you as any evidence that he is more likely to be guilty than not guilty. You must not speculate as to why he is in custody. In determining the issues in this case, disregard this matter entirely." (See also CALCRIM No. 204.)

use of physical restraints in the courtroom. (*People v. Hill* (1998) 17 Cal.4th 800, 841 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *Duran, supra,* 16 Cal.3d at p. 293, fn. 12; see also *People v. Taylor, supra,* 31 Cal.3d at p. 496 [trial court erred in adhering to a local jail rule that prevented defendant from wearing civilian clothing at trial].)

■ Although we conclude that a heightened showing of manifest need is not required to justify the stationing of a security officer near the witness stand, the responsibility of the trial court remains the same. The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis. (*Spivey v. Head* (11th Cir. 2000) 207 F.3d 1263, 1271–1272; cf. *People v. Hill, supra,* 17 Cal.4th at pp. 841–842.) Under *Holbrook, supra,* 475 U.S. at page 570, the trial court has the first responsibility of balancing the need for heightened security against the risk that additional precautions will prejudice the accused in the eyes of the jury. "It is that judicial reconciliation of the competing interests of the person standing trial and of the state providing for the security of the community that, according to [Supreme Court precedent], provides the appropriate guarantee of fundamental fairness." (*Lopez v. Thurmer* (7th Cir. 2009) 573 F.3d 484, 491.) The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant. In addition, although we impose no sua sponte duty for it to do so, the court should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custodial status. (See, e.g., *Marks, supra,* 31 Cal.4th at p. 223.)

The record in this case could be clearer, but, overall, it demonstrates that the trial court came to its own conclusion about the stationing of the deputy and did not abdicate control to law enforcement. Before defendant testified, defense counsel said that he had heard secondhand about a "policy" of posting a deputy near the defendant at the witness stand, and he set forth his objections to this procedure.[9] In response, the trial court mentioned a sheriff's department "policy of having a deputy at the stand with an in-custody [defendant] for safety purposes, or even to prevent escape." However, the court's full response indicates it was not blindly adhering to a law enforce-

---

[9] No evidence regarding the particulars, or even the existence, of this asserted policy appears in the record or has been put before this court in a request for judicial notice. The omission is telling. We have not encountered this "policy" in any other case that has reached us from Alameda County, nor has it been mentioned in other reported cases from the Court of Appeal.

ment decision. The court observed that it considered the precaution to be "reasonable," and noted that "jurors are much more concerned about their own safety these days anyway." The court went on to explain why it believed the presence of a deputy at the witness stand would actually benefit defendant: "I don't want the jury in any way to be distracted by any of those [safety] concerns, because the jury knows that the Defendant's in custody, and I don't want them to have that kind of a distraction when he's testifying. If he decides to testify, it's certainly in his best interest not to have the jury distracted by concerns they have of their own safety. He wants them to listen to him." This observation is particularly apt in light of the two juror notes the court had received remarking on defendant's demeanor. In addition, the trial court observed defendant would not be prejudiced by the procedure because a deputy had been seated behind defendant throughout the trial, and "[h]aving the deputy in, basically, the same proximity, . . . will be no more prejudicial than it has been to that point."

Although not a model of clarity, these observations indicate the trial court exercised its own judgment, on a case-specific basis, when it ordered a deputy to be stationed near the witness stand. The court weighed the matter and concluded the procedure was appropriate under the circumstances. The trial court was well aware of defendant's volatility, having heard testimony from numerous witnesses about defendant's dramatic attempt to escape from the police, his erratic behavior during the standoff, and his combativeness after he was taken into custody. The court had also recently been informed about phone calls defendant had arranged from jail trying to persuade the victim and her mother to drop the charges against him. The court had concluded these improper contacts represented an attempt to suborn perjury and were "clearly an implied threat" against the victim and her family. This record reflects no abuse of discretion.

In summary, we hold as follows. Trial court decisions regarding courtroom security continue to be reviewed for abuse of discretion. Any exercise of discretion must be informed by the particular circumstances of a given case. Many security and decorum procedures are routine and do not run the risk of prejudice. However, when the court imposes a measure that is inherently prejudicial to the defendant's right to assist in his defense, competently present his own testimony, or enjoy the presumption of innocence, the trial court must take particular care. In order to employ an inherently prejudicial procedure, the court must find a manifest need sufficient to justify the risk of prejudice. When an inherently prejudicial procedure is employed, a reviewing court will inquire whether, based on the record below, the trial court reasonably balanced the need for heightened security against the constitutional rights afforded the defendant. Only a showing of

manifest need will support the use of such measures. Inherently prejudicial practices include visible shackling, stun belts, or other affronts to human dignity, or methods that convey to the jury that the defendant must be separated from the community at large because he is especially dangerous or culpable, or is the cause of some official concern or alarm. (See *Holbrook, supra,* 475 U.S. at p. 569.) Although the stationing of a security officer at the witness stand during an accused's testimony is not an inherently prejudicial practice, the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy.

## DISPOSITION

We affirm the judgment of the Court of Appeal.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MORENO, J.,** Dissenting.—Defendant's daughter accused him of sexually assaulting her and giving her drugs; defendant denied doing either. Their testimony constituted the only direct evidence of what actually occurred. Thus, as Justice Ruvolo aptly noted in his dissent below, "The jury's decision necessarily turned on whether it believed the version of events testified to by the victim, or by the [defendant]—a classic 'she said/he said' trial." "[T]he evidence presented at trial, although consistent with guilt, was equivocal and inconclusive. On the one hand, if the victim were believed, then appellant would be doubtlessly found guilty of the charges. On the other hand, if appellant were believed, a not guilty verdict was inevitable. [¶] . . . Therefore, the state of the evidence rendered it critical for the trial judge not to allow the demeanor, and thus the credibility, of either of the two key witnesses to be enhanced or diminished unfairly."

In this case, we consider whether defendant's rights were violated when the trial court permitted a uniformed deputy sheriff to escort defendant to the witness stand and then sit next to him as he testified. This procedure was not followed for any other witness. In affirming the Court of Appeal's judgment that the trial court did not abuse its discretion, the majority reasons the security arrangement in this case was legally indistinguishable from the routine deployment of security personnel in a courtroom. I disagree.

As with the use of physical restraints (*Deck v. Missouri* (2005) 544 U.S. 622 [161 L.Ed.2d 953, 125 S.Ct. 2007] (*Deck*)) or prison attire (*Estelle v. Williams* (1976) 425 U.S. 501 [48 L.Ed.2d 126, 96 S.Ct. 1691] (*Estelle*)) in front of a jury, the stationing of a uniformed officer next to a defendant as he or she testifies is the kind of government action that constitutes an "unmistakable indication[] of the need to separate a defendant from the community at large"

(*Holbrook v. Flynn* (1986) 475 U.S. 560, 569 [89 L.Ed.2d 525, 106 S.Ct. 1340] (*Holbrook*)) and "is likely to lead the jurors to infer that [a defendant] is a violent person disposed to commit crimes of the type alleged. [Citations.]" (*People v. Duran* (1976) 16 Cal.3d 282, 290 [127 Cal.Rptr. 618, 545 P.2d 1322] (*Duran*).) Consequently, I would hold that such an unmistakably defendant-focused security arrangement is inherently prejudicial and permissible only if the trial court first identifies an essential case-specific state interest justifying its use. As the majority acknowledges, no such justification (such as, for example, defendant posing a security or flight risk) was identified in this case in support of the trial court's decision to permit the security measure. I would thus reverse the judgment of the Court of Appeal and remand the matter for a new trial. I therefore dissent.

## I.

As the majority relates the facts of this case, I do not repeat them, and instead focus on the security arrangement at issue here.

Throughout the trial, while defendant was at the defense table, an Alameda County deputy sheriff sat behind him. During a recess on the day defendant testified, defense counsel indicated that the trial court and the courtroom deputies had informed him that, pursuant to policy, a deputy sheriff would accompany defendant to the witness stand and sit next to him as he testified. Defense counsel objected to the arrangement, arguing that stationing a deputy next to defendant on the stand would be tantamount to a "human shackle" which, absent a determination of good cause specific to the trial, would violate both the federal and state Constitutions. Defense counsel further pointed out that there was no evidence suggesting defendant posed a safety or flight risk.

The trial court overruled the objection. In explaining its ruling, the trial court equated a deputy sitting next to defendant as he testified with a deputy sitting behind defendant while at the defense table; the court stated the former would "be no more prejudicial" than the latter. The trial court also indicated the "Sheriff's Department policy of having a deputy at the stand with an in-custody [defendant] for safety purposes, or even to prevent escape, is certainly reasonable . . . ." Finally, the trial court commented that a previous juror had expressed discomfort "with a police officer in full uniform with a weapon sitting at the witness stand. And I don't want the jury in any way to be distracted by those concerns . . . ."[1] A uniformed deputy

[1] As the majority notes (maj. opn., *ante*, at p. 632), the prosecutor also remarked that defendant had become agitated in the presence of some deputies and one of the jurors had noticed his agitation. The record demonstrates, however, that the trial court did not base its ruling on the prosecutor's assertion. Moreover, it was later clarified that the juror referred to by the prosecutor did not feel threatened by defendant. (*Ibid.*)

sheriff[2] subsequently escorted[3] defendant to the witness stand and sat immediately next to him as he testified.

On appeal, a divided Court of Appeal affirmed defendant's conviction. The majority concluded the security arrangement was comparable to the routine stationing of security personnel in a courtroom and is therefore reviewed for abuse of discretion. On the other hand, the dissent reasoned that having a deputy escort defendant to the stand and then, in the jury's direct view, sit next to defendant as he testified implicates the same concerns cited in federal and state shackling cases; thus, adoption of the security measures should have been preceded by a finding of a case-specific state interest.

## II.

I begin by briefly discussing the well-established law governing, on the one hand, inherently prejudicial measures such as the use of prison attire or physical restraints during a criminal trial and, on the other hand, the general deployment of courtroom security personnel.

## A.

The United States Supreme Court has closely scrutinized courtroom practices that risk undermining the fairness of the criminal factfinding process by diluting the presumption of innocence. For example, in *Estelle, supra,* 425 U.S. at pages 504 to 505, the court held that compelling a defendant to wear prison garb in front of the jury could infect the jury's judgment and posed an

---

[2] There is some confusion over whether the deputy was armed. The majority and dissenting opinions below describe the deputy as armed, but the record itself is silent on the subject. (Maj. opn., *ante*, at p. 631, fn. 1.) Whether the deputy was armed does not alter my conclusion.

[3] The majority suggests it is alternatively possible that a deputy deployed elsewhere in the courtroom simply moved to the vicinity of the witness box (rather than the deputy seated behind defendant at the defense table *escorting* defendant to the stand). (Maj. opn., *ante*, at p. 636, fn. 4.) However, after noting a deputy was seated behind defendant throughout the trial, the trial court then stated, "[h]aving *the* deputy in, basically, the same proximity, I think, will be no more prejudicial . . . ." (Italics added.) The reasonable inference to be drawn is that the same deputy that had been seated behind defendant, left his or her position to escort defendant to the stand.

The majority also indicates the record is silent as to *where* the deputy was stationed during defendant's testimony. (Maj. opn., *ante*, at p. 636, fn. 4.) To the contrary, when objecting to the arrangement, defense counsel stated the deputy would be seated next to defendant on the witness stand. And, after defendant testified, counsel stated for the record that the officer had been "with [defendant] up on the stand next to him . . . ." Neither the trial court nor the prosecutor disagreed with defense counsel's characterization of the security arrangement. Nor does the Attorney General contest defendant's description of the layout. I therefore find no reason to quibble with Justice Ruvolo's conclusion that the deputy "s[a]t right beside the accused" in full view of the jury.

"unacceptable risk . . . of impermissible factors coming into play. [Citation.]" The court noted that the use of prison attire could " 'have a significant effect on the jury's feelings . . .' [citation]" while serving no essential state policy. (*Id.* at p. 505.) The court also noted that a policy requiring only in-custody defendants to wear prison attire, such as the one at issue in that case, posed a potential violation of equal protection principles.[4] (*Estelle*, at pp. 505–506.)

Similarly, both the high court and this court have closely examined the use of physical restraints visible to the jury during a criminal trial, requiring a trial court to first determine that their use was justified by a state interest specific to the trial. (*Deck, supra*, 544 U.S. at p. 629; *Duran, supra*, 16 Cal.3d at pp. 290–291.) This rule has long been in effect in this state. (See *People v. Harrington* (1871) 42 Cal. 165, 168 [finding prejudicial error where physical restraints were used without a finding of "evident necessity"].) One reason for the "[j]udicial hostility" to physical restraints is that, as with prison attire, the use of such measures "undermines the presumption of innocence and the related fairness of the factfinding process. [Citation.] It suggests to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.' [Citations.]" (*Deck*, at pp. 630–631; see *Duran*, at p. 290 [A defendant's "appearance before the jury in shackles is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged. [Citations.]"].)

Despite these concerns, like the high court, we have nevertheless acknowledged that there are occasions when trial judges may be warranted in restraining defendants, for example, when a defendant poses a safety or flight risk or when a defendant disrupts the proceedings or otherwise engages in nonconforming behavior. (*Deck, supra*, 544 U.S. at p. 632; *Duran, supra*, 16 Cal.3d at p. 291.) However, we have emphasized that the need for using physical restraints *must* appear as a matter of record and that the restraints should be as unobtrusive as possible, although as effective as necessary under the circumstance. (*Duran*, at p. 291.)

**B.**

In contrast to the scrutiny applied to inherently prejudicial practices, the United States Supreme Court and this court have been more deferential to the general deployment of security personnel in a courtroom, concluding that

---

[4] Although the trial court here indicated the Alameda County Sheriff's Department has a policy of accompanying all in-custody defendants to the stand (a statement unchallenged by the prosecutor or the deputy sheriff in the courtroom), the majority suggests no such policy exists. (Maj. opn., *ante*, at p. 642, fn. 9.) I reach no conclusion on this point; however, if such a policy exists, it would seem to raise the same potential equal protection violation discussed in *Estelle, supra*, 425 U.S. at pages 505 to 506.

such measures do *not* require a trial court to make a finding of manifest need, but rather are reviewed for abuse of discretion. (*Holbrook, supra*, 475 U.S. at pp. 568–569; *People v. Marks* (2003) 31 Cal.4th 197, 224 [2 Cal.Rptr.3d 252, 72 P.3d 1222] (*Marks*); *Duran, supra*, 16 Cal.3d at p. 291, fn. 8.)

In *Holbrook*, uniformed security personnel were seated in the first row of the courtroom's spectator section. (*Holbrook, supra*, 475 U.S. at pp. 568–569.) The high court concluded the arrangement did not violate the defendant's federal constitutional rights because such a deployment is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." (*Ibid.*) The court explained that, "[w]hile shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status." (*Id.* at p. 569.)

In *Marks*, the trial court stationed a deputy sheriff next to and slightly behind Juror No. 7, "four or five feet" away from the witness stand, as the defendant testified. (*Marks, supra*, 31 Cal.4th at p. 223 & fn. 5.) Before doing so, the trial court noted the defendant had assaulted an attorney in court and a deputy sheriff during the case, had violated court orders, and had been removed from the courtroom for being verbally disruptive during the trial.[5] (31 Cal.4th at p. 223.) The defendant appealed, arguing the trial court was required to identify a manifest need justifying the security arrangement. (*Ibid.*) We rejected the claim, concluding that stationing security personnel to monitor a defendant does not require a showing of manifest need. (*Id.* at pp. 223–224.) Echoing *Holbrook*, we reasoned "courtroom monitoring by security personnel does not necessarily create the prejudice created by shackling." (*Ibid.*) Unlike the use of restraints, we concluded, " 'it is entirely possible that jurors will not infer anything at all from the presence of the guards . . . so long as their numbers or weaponry do not suggest particular official concern or alarm.' ([*Holbrook, supra*, 475 U.S.] at p. 569.)" (*Marks*, at p. 224.)

---

[5] In addition, the *defendant's* attorneys requested the trial court use physical restraints on their client; one was concerned the defendant might attack him during the trial and the other was worried the defendant would hurt his defense by committing misconduct in front of the jury. (*Marks, supra*, 31 Cal.4th at p. 222.)

## III.

Turning to the security measure at issue here—a uniformed deputy sheriff escorting defendant to the witness stand and then sitting, in the jury's view, next to him as he testified—I conclude the arrangement is unlike the general deployment of security personnel in a courtroom, but instead, as with the use of physical restraints or prison attire, poses a serious risk to the presumption of innocence and to the right to a fair trial and thus requires a trial court to first find a manifest need for using such measures. In so concluding, the critical question, as explained by the United States Supreme Court, is how a security measure will be perceived by the jury. (*Holbrook*, *supra*, 475 U.S. at p. 569.) Will an arrangement be interpreted as being motivated by the trial court's specific concerns about the defendant, like the use of physical restraints, or will it be viewed as a routine part of the courtroom drama, like having a bailiff stand near the court clerk?

Contrary to the majority, I believe there can be no reasonable doubt that the security measure employed here suggested "particular official concern or alarm" (*Holbrook*, *supra*, 475 U.S. at p. 569) about defendant and invited consideration of impermissible factors (*Estelle*, *supra*, 425 U.S. at p. 505). Having a uniformed officer escort a defendant to the stand and then sit right next to him or her as he or she testifies suggests to the jury that the trial court has determined a need for security personnel to interpose themselves between the defendant and the jury box lest the defendant attempt to attack the jurors or the judge. (See *Deck*, *supra*, 544 U.S. at p. 630.) Jurors would also likely infer that the trial court believed the defendant was disposed to commit the type of crimes with which he or she was charged. (See *Duran*, *supra*, 16 Cal.3d at p. 290.) The fact that a defendant, *and only the defendant*, is accompanied by a uniformed guard as he or she testifies cannot help but " 'have a significant effect on the jury's feelings' " (*Estelle*, at p. 505) and leave the impression that there is a " 'need to separate a defendant from the community at large' "[6] (*Deck*, at pp. 630–631).

The security arrangement at issue stands in stark contrast to the general deployment of security personnel approved of in *Holbrook*. As the United States Supreme Court explained, a jury could reasonably infer that having

---

[6] In this case, the danger was heightened because, in contrast to defendant's deputy sheriff escort, defendant's daughter was accompanied during her testimony by a support person pursuant to Penal Code section 868.5. The majority dismisses the risk, reasoning jurors could have simply concluded it was routine for the key witnesses to be accompanied by another person. (Maj. opn., *ante*, at p. 641.) It beggars the imagination that jurors could have drawn such an innocuous inference from a defendant being accompanied by a uniformed officer during his testimony while the prosecuting witness was accompanied during her testimony by someone explicitly identified to the jury as a "victim witness advocate."

officers sit in the first row of the spectator section is not motivated by specific concerns about the defendant, but is instead intended "to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards." (*Holbrook, supra*, 475 U.S. at p. 569.) The court continued, "If [guards] *are placed at some distance from the accused*, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status." (*Ibid.*, italics added.)

Nor is the arrangement here like the one we approved of in *Marks*. There, the marshal was stationed "*next to and slightly behind* Juror No. 7."[7] (*Marks, supra*, 31 Cal.4th at p. 223, fn. 5, italics added.) Not only was the jury able to watch the defendant testify without having to simultaneously watch an officer guard the defendant, but nothing in the arrangement suggested particular alarm. Indeed, the trial court specifically admonished the jury that the marshal sitting next to the jury box was " 'a perfectly normal procedure.' "[8] (*Marks*, at p. 223.)

Here, of course, defendant's uniformed escort remained at his side as he walked to and from the witness stand and as he testified. It is difficult to imagine therefore that the jury interpreted the security measure as an "element[] of an impressive drama [rather] than as [a] reminder[] of the defendant's special status."[9] (*Holbrook, supra*, 475 U.S. at p. 569.) Nor is it likely the jury believed that a uniformed escort assigned to defendant alone was providing general security for the courtroom. The very nature of the arrangement underscored that it was focused on defendant and the risk he might pose.

Thus, I conclude that, like physical restraints or prison clothing, the security arrangement in this case was inherently prejudicial and posed a

---

[7] The majority correctly observes (maj. opn., *ante*, at p. 636, fn. 5) that in *Marks, supra*, 31 Cal.4th at page 223, the trial court indicated "it would position a marshal in a chair next to defendant on the raised platform . . . ." However, we subsequently pointed out that "It appears that the marshal sat four or five feet from defendant's side (facing his ear) next to and slightly behind Juror No. 7." (*Id.* at p. 223, fn. 5.) Not only is the footnote the more specific description of the layout—it indicates the marshal was stationed next to the jury box (and *not*, as the majority implies (maj. opn., *ante*, at p. 636, fn. 5), in between the jury and defendant).

[8] This is in contrast to the more general instruction given by the trial court in this case instructing the jury not to consider or speculate about the fact " 'that the Defendant is in custody . . . .' " (Maj. opn., *ante*, at p. 641, fn. 8.)

[9] Thus, unlike *Marks*, the jury in this case could not help but see the deputy sheriff while watching defendant testify.

serious risk to the presumption of innocence and to the right to a fair trial.[10] As such, while the measure might be justified under certain circumstances, the trial court should have first found a manifest need to justify permitting the arrangement. No manifest need, such as defendant posing a flight or safety risk, was identified by the trial court in support of the use of a uniformed escort. Rather, the trial court justified its decision by concluding that the arrangement was no more prejudicial than having a guard sit behind defendant at the defense table and that the sheriff's department justification for its blanket policy of accompanying all in-custody defendants was reasonable, and by relating an anecdote about a previous juror being uncomfortable with an armed police officer sitting at the witness stand. None of these reasons suffice.

Reversal is required unless the state can prove the error was harmless "beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) In applying the *Chapman* standard to the erroneous use of physical restraints, the *Deck* court explained that the use of restraints "will often have negative effects, but—like 'the consequences of compelling a defendant to wear prison clothing' or of forcing him to stand trial while medicated—those effects 'cannot be shown from a trial transcript.' [Citation.]" (*Deck, supra,* 535 U.S. at p. 635.) "Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the . . . error complained of did not contribute to the verdict obtained.' [Citation.]" (*Ibid.*) The same is true of the error in this case.

Here, as Justice Ruvolo explained, the evidence at trial was equivocal and inconclusive and the trial's outcome essentially rested on whether the jury believed defendant or his daughter. For example, although there was some evidence to corroborate the victim's version of events, such as the rock of "crystal" she gave her grandmother and the red mark on the victim's neck, there was also testimony that the victim had such a mark on her neck on a

---

[10] The majority cites two federal court of appeals decisions (*Wainwright v. Lockhart* (8th Cir. 1996) 80 F.3d 1226, 1232; *U.S. v. Williams* (8th Cir. 1990) 897 F.2d 1430, 1434) and two Illinois state court decisions (*People v. Peeples* (2002) 205 Ill.2d 480, 525–532 [275 Ill.Dec. 870, 793 N.E.2d 641, 669–672]; *People v. Hughes* (1990) 205 Ill.App.3d 79, 83–84 [150 Ill.Dec. 463, 562 N.E.2d 1266, 1269]) that held otherwise. (Maj. opn., *ante,* at pp. 639–640.) However, those courts' holdings were based on the notion that there is no legally significant difference between an officer sitting behind a defendant at the defense table and an officer escorting a defendant to the stand and sitting next to the defendant as he or she testifies. Common sense requires the rejection of such a dubious premise.

prior occasion and that the victim had previously made up a story that she had been stabbed in order to get defendant to call her. Given the state of the evidence, it cannot be demonstrated beyond a reasonable doubt that the trial court's error did not contribute to defendant's conviction, and it should therefore be reversed. (*Chapman v. California, supra*, 386 U.S. at p. 24.) I respectfully dissent.

Kennard, J., concurred.

Appellant's petition for a rehearing was denied December 23, 2009. Werdegar, J., did not participate therein. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.