Filed 11/8/13  P. v. Frank CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

---

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C068050 |
| v. | (Super. Ct. No. 09F06893) |
| KYLE DOUGLAS FRANK, | |
| Defendant and Appellant. | |

On four separate occasions during the summer of 2009, defendant Kyle Douglas Frank opened fire at vehicles on the freeway while driving under the influence of both alcohol and cocaine.  He was tried by jury and convicted of eight counts of attempted murder (Pen. Code, §§ 664/187, subd. (a))[1], during which he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and four counts of willful and malicious discharge of a firearm at an occupied vehicle (§ 246).  The trial court sentenced defendant

---

[1]     Undesignated statutory references are to the Penal Code.

1

to serve an aggregate determinate term of 90 years in state prison and imposed other orders, including an order requiring defendant to pay a main jail booking fee.

On appeal, defendant contends: (1) the trial court prejudicially erred and violated his constitutional rights to due process and to a unanimous jury verdict by dismissing a juror (Juror No. 9) during deliberations for intentionally concealing material information during voir dire; (2) the trial court abused its discretion by ordering a sheriff's deputy to stand near defendant while he testified based on standing practice rather than a case-specific analysis that balanced the need for heightened security against the danger of prejudice to defendant's case; and (3) the main jail booking fee must be stricken because there is no substantial evidence of defendant's ability to pay the fee imposed.

We disagree and affirm the judgment. As we explain, the record supports the trial court's conclusion that Juror No. 9 intentionally concealed material information during voir dire. Juror No. 9 was directly asked on his juror questionnaire whether "[he], a close friend or relative [had] ever been a victim of crime." He initially answered, "No." During voir dire, after some of the prospective jurors mentioned their homes being broken into, Juror No. 9 amended his response to reveal his "parents were victims of burglary a long, long time ago," and he "was witness to that." However, during deliberations, he revealed to his fellow jurors he was home when the burglary occurred and was shot in the foot by the perpetrator. During voir dire, prospective jurors who revealed an assault during a burglary or that they were shot at were removed from the jury. Juror No. 9 omitted the fact he was shot during the burglary. And when he was selected as one of the jurors, he stated: "I made it." Based on these facts, the trial court was justified in concluding Juror No. 9's concealment of this fact was intentional. His removal from the jury violated neither section 1089 nor defendant's constitutional rights.

Turning to defendant's remaining contentions, we conclude his failure to object when the trial court ordered a sheriff's deputy to stand near him while he testified forfeits his assertion on appeal that this decision constituted a prejudicial abuse of discretion. In any event, even if the issue were preserved, we find no prejudice. Finally, defendant has also forfeited his contention that the order requiring defendant to pay the main jail booking fee is not supported by substantial evidence.

FACTS

Defendant was fired from his job as a truck driver in the summer of 2009. The job loss resulted in defendant moving in with his father and stepmother. His girlfriend broke up with him around the same time. In August 2009, defendant was hired by Thunder Valley Casino as a porter, doing janitorial work, but he "wasn't happy about that job." These events caused defendant to begin drinking on a daily basis, "at least a six-pack at the minimum." Defendant also began using cocaine "[a]t least once a week." The combined effect of alcohol and cocaine made defendant "nervous" and "paranoid." Shortly before the first shooting incident, defendant began carrying a loaded .25 caliber semi-automatic handgun in the center console of his Nissan Altima.

### *The First Shooting Incident* (*Counts 1 and 2*)

On August 22, 2009, at around 11:00 p.m., defendant was driving eastbound on the Capitol City Freeway. He was under the influence of both alcohol and cocaine and was driving below the speed limit in the fast lane. Before the Watt Avenue exit, defendant's Altima was approached quickly from behind by a Nissan 350Z driven by Paul Adcock. After briefly tailgating the Altima, Adcock changed lanes to pass defendant. Adcock looked into the Altima as he passed and saw defendant "screaming" and giving him the "single finger salute." Adcock, who is African-American, could not hear what defendant was yelling, but he "could make out the word 'nigger' " by reading

3

defendant's lips.  Adcock returned to the fast lane after passing the Altima.  Defendant then changed lanes, caught up to the 350Z a few seconds later, and continued his angry tirade alongside Adcock's car.  As Adcock described:  "The [word] nigger came up quite a few times again and he was angry.  He just seemed very tense about something."

At this point, Adcock realized defendant's Altima would not be able to keep up with his 350Z, so he pressed down on the gas pedal.  As Adcock created some distance between himself and the unwanted confrontation, defendant grabbed the handgun he kept in his center console and fired "four or five shots" at Adcock's car.  One bullet shattered Adcock's passenger side mirror and others hit the passenger door, passenger side windshield frame, and hatchback roof.  Adcock called 911 on his cell phone as he drove home.  Officers with the California Highway Patrol (CHP) met Adcock at his house and took his statement.

### The Second Shooting Incident (Counts 3 through 6)

On August 31, 2009, at around 8:00 p.m., defendant was driving on Florin Road approaching Interstate Highway 5.  He was again under the influence of both alcohol and cocaine.  As defendant got onto the freeway onramp, he began tailgating a Dodge Caravan driven by Tina Arteaga.  Arteaga's 14-year-old daughter, Isabella, and four-year-old son, Christopher, were also in the minivan.  Christopher was in the front passenger seat.  Isabella was seated directly behind Arteaga.  Noticing defendant following at a distance of "[m]aybe a foot," Arteaga "veered over to the right a little bit so [defendant] could see that there was a big rig in front of [her] and there was nowhere [she] could go."  Defendant began "going to the left, going to the right, going to the left, going to the right, getting closer, scooting back, getting closer."  When Arteaga reached the freeway, she stayed to the right while defendant passed her on the left and yelled something at her.  Arteaga responded by yelling:  "Watch how you are fucking driving.

4

My kids are in the car with me." Defendant then pulled out the handgun used in the previous shooting, reached over the back seat with the gun, and fired four rounds at Arteaga's minivan through the Altima's open right rear window. Bullets hit the driver's side headlight, wheel well, and door frame. Arteaga called 911 and met with CHP officers at Isabella's father's house.

### *The Third Shooting Incident* (*Counts 7 and 8*)

On September 6, 2009, at around 10:00 p.m., defendant was driving northbound on Interstate Highway 5 near Sutterville Road. Again, he was under the influence of both alcohol and cocaine. Jaime Hernandez was traveling the same direction in a Nissan Maxima. Hernandez noticed defendant "swerving in and out of traffic cutting people off left and right." When defendant cut in front of Hernandez's Maxima, Hernandez flashed his high beams, prompting defendant to hit his brakes three times in rapid succession. Hernandez also hit the brakes to avoid colliding with defendant's Altima. He then changed lanes to the right and "accelerate[d] past [defendant] to get away." Defendant followed in pursuit, catching up to Hernandez a short distance down the freeway. At this point, defendant changed lanes to the right, pulled up beside the Maxima, and fired four rounds into the side of Hernandez's car. Three bullets lodged in the front and rear passenger doors. One bullet went through the front passenger door and lodged in the back of the front passenger's seat. Hernandez accelerated away from the gunfire and watched as defendant merged onto the Capitol City Freeway. Hernandez then exited the freeway at Richards Boulevard and pulled into a McDonald's parking lot to assess the damage. Several days later, Hernandez gave a statement to police, providing a description of defendant's car along with a partial license plate number ("5NZK" or "5MZK"); the plate number of defendant's Altima was 3NZK296.

5

### Fourth Shooting Incident (*Counts 9 through 12*)

On September 9, 2009, at around 8:00 p.m., defendant was driving eastbound on Interstate Highway 80 near Antelope Road. Yet again, defendant was under the influence of both alcohol and cocaine. Monica Esparza was traveling the same direction in a Dodge Caravan. Esparza's niece, Osiris, and son, Antonio, were also in the minivan. Osiris was in the front passenger seat. Antonio was seated directly behind Osiris. Defendant's Altima approached Esparza's minivan from behind at a high rate of speed, causing Esparza to change lanes to the right to allow him to pass her on the left. Instead, defendant followed Esparza to the right, cut across two lanes of traffic, and pulled up next to the minivan's passenger side. Defendant pulled out the same handgun used in the previous shootings and yelled, "what nigga," "fuck you," and "motherfucker" out the window. With defendant's left hand on the steering wheel and the gun resting on his left bicep, defendant fired at least five rounds into the side of the minivan. Three bullets hit the front passenger door. One of these bullets penetrated the door and hit Osiris in the leg. One bullet hit the minivan's rear sliding door. A fifth bullet went through the right rear passenger door window. Esparza took the next exit, drove home, and called the police.

### Defendant's Arrest and Conviction

On September 13, 2009, defendant was stopped by a CHP officer while driving under the influence of alcohol and cocaine. Based on defendant's "red, watery eyes" and "dilated pupils," the officer believed defendant was under the influence of either alcohol or marijuana. Defendant was taken into custody after failing a field sobriety test. On the way to the CHP office, defendant asked why he was under arrest when his breath had not been tested. When the officer explained such a test would not detect the presence of marijuana, defendant began an "aggressive, agitated and extremely derogatory" rant,

6

exclaiming that "only niggers smoke that" and asking the officer whether he "look[ed] like a stupid nigger." He used "the word 'nigger' probably approximately 12 times all the way up to the [CHP] office."

Law enforcement officers found four expended shell casings inside defendant's Altima. Defendant's handgun was found in his bedroom. Bullets taken from Arteaga's minivan and Hernandez's Maxima were identified as having been fired from defendant's gun. Bullets taken from the other vehicles were consistent with defendant's gun, but could not be conclusively matched.

As mentioned, defendant was tried by jury and convicted of eight counts of attempted murder, during which he personally and intentionally discharged a firearm, and four counts of willful and malicious discharge of a firearm at an occupied vehicle. Hate crime allegations attached to each count were found to be not true. At trial, defendant admitted to the shootings, but denied intending to kill anyone and further denied harboring any racial animus.

DISCUSSION

I

*Dismissal of Juror No. 9*

Defendant contends the trial court prejudicially erred and violated his constitutional rights to due process and to a unanimous jury verdict by dismissing Juror No. 9 during deliberations for intentional concealment of material information during voir dire. We disagree.

A.

*Additional Background*

Juror No. 9 was asked on his juror questionnaire whether "[he], a close friend or relative [had] ever been a victim of crime." He answered, "No." During voir dire, after

7

some of the prospective jurors mentioned their homes being broken into, Juror No. 9 stated: "I need to add something to the voir dire," and explained: "Because my parents were victims of burglary a long, long time ago, I was witness to that." In response to the trial court's questions, Juror No. 9 revealed the burglary occurred in Detroit, Michigan, and no one was arrested for the crime. The trial court then asked: "Is there anything about having witnessed that incident and not having anybody arrested or prosecuted that would cause you a concern yourself on your own ability to stay objective in this case?" Juror No. 9 answered: "No." The trial court then asked: "Can you think of anything else in your background or training the attorneys might find of interest?" Juror No. 9 answered: "No."

Prior to Juror No. 9 being questioned by the trial court, one of the prospective jurors (R.) revealed an incident that occurred "10 years ago," in which his house was "burglarized" and his mother was "attacked . . . with an ice pick in [the] garage" during the burglary. Also prior to Juror No. 9 being questioned, another prospective juror (C.) revealed an incident that occurred "20 years ago," in which her brother was driving her father's car and someone fired a shotgun at the vehicle. After Juror No. 9 was questioned, another prospective juror (V.) revealed an incident that occurred "30 years ago," in which she and a friend were shot at while driving. V. was removed by the trial court after she stated she "would not be in the frame of mind to be fair to anyone" because the school she worked for would not be able to cover for her absence and she would be "worried about [her] kids." During the first round of peremptory challenges, the prosecution used a peremptory challenge to remove R. from the panel. Immediately thereafter, defense counsel used a peremptory challenge to remove C.

Voir dire continued. Other prospective jurors revealed that their homes had been broken into. One prospective juror, who was seated on the jury as Juror No. 5, revealed

he witnessed a "breaking and entering" that occurred "30, 35 years ago." Juror No. 5 also revealed he was the victim of an armed robbery that occurred "35, 40 years ago." In connection with the "breaking and entering" incident, the trial court asked whether there were "any weapons involved." Juror No. 5 answered: "No."

Despite the fact Juror No. 9 was aware he could amend his previous response to voir dire questions, having done so after hearing other prospective jurors mentioning their homes being broken into, and despite the fact he witnessed one prospective juror removed after revealing that his mother was attacked during a burglary and two other prospective jurors removed after recounting shooting incidents, Juror No. 9 did not amend his previous response to reveal what he later shared with his fellow jurors during deliberations, i.e., that he was not simply a witness to *his parents* having their house burglarized. Instead, he was home when the burglary occurred and was shot in the foot by the burglar. Thus, Juror No. 9 omitted the fact *he* was the victim of an assault with a firearm during the burglary.

During deliberations, the trial court received a note from the jury stating that a majority of the jury wanted Juror No. 9 "removed for obstructing the process and bias." Upon receiving the note, the foreperson was brought into the courtroom and questioned. She explained that six or seven jurors had complained Juror No. 9 did not "seem mentally stable," he was "changing his mind every 30 seconds," he had accused her of having "ulterior motives" and "trying to sway the [jury's] decision," and he was "deriding [her] personal experience" and that of other jurors.

Juror No. 9 was then brought in for questioning. The trial court explained: "[T]here have been some concerns raised by other jurors that maybe you're not allowing the process to move forward in a way that somehow manifests some bias and a concern about whether or not you're really treating the other jurors courteously. [¶] Do you have

9

-- as you sit here talking about it, do you have in mind things that you've done in the deliberation room that would be viewed by the other jurors as not being courteous?" Juror No. 9 responded: "No, I wouldn't characterize it as that. May be taken as that." He then mentioned he had "some problems" with certain comments made by the foreperson at the start of their deliberations he perceived as the foreperson "immediately trying to skew [the deliberations] in her favor." The trial court explained it was "not in any way in the position to dictate how the jury goes and does its duty" and asked Juror No. 9 whether he had said anything in the deliberation room that "could be perceived by other jurors as indicating a bias about the matter." Juror No. 9 responded: "Uh, first of all, I'm the lone hung juror in the verdict in several of the counts, so several of them have accused me of being biased. But you're asking me have I said something that they perceived as bias --" The trial court clarified: "Well, you know, something that as you look at it now would say, yes, that was an indication that I wasn't able to keep deliberating, wasn't --" Juror No. 9 answered: "I haven't told them that I was in any way not wanting to deliberate anymore. I did tell them based on my experience -- and we all shared some of our experiences in trying to resolve the decisions from this case, and it was [in] the instructions to use your experiences." The trial court responded: "Sure." Juror No. 9 continued: "I had a particular instance that made it clear to me that there was a reasonable doubt on something. And I think that that was perhaps perceived as bias." The trial court then stated it wanted to avoid "getting into specifics," again stated it was not in the "position in any way to get in and resolve things for a jury," and asked: "Is there anything that in your mind precludes you from continuing to deliberate with the other jurors, continuing to treat them courteously and going on with the process?" Juror No. 9 responded: "There's nothing. It's a two-way street. I told you I'm the one that's

10

under the gun. I've been called an idiot already. Okay. I've never called anybody an idiot. I never told them I didn't want to go on or answer their questions."

The trial court called in the entire jury and reread a portion of CALCRIM No. 3550: "It is your duty to talk with one another and to deliberate in the jury room. You must try to agree on a verdict, if you can. Each of you must decide the case for yourself but only after having discussed the evidence with the other jurors. [¶] Do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because other jurors disagree with you. Keep an open mind and openly exchange your thoughts and ideas. [¶] Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other." The trial court then ordered the jury to return to their deliberations.

After the jury stepped into the hallway, Juror No. 10 returned to the courtroom and asked the trial court: "Can I say something to you?" The trial court had Juror No. 10 take a seat in the jury box and heard her complaints about Juror No. 9: "Well, this guy I just don't think he's mentally stable. I mean, he's not rational. He's in everybody -- everybody thinks that. All of us think that. And we're just never going to come to a conclusion. I mean, he's just not in his right mind. [¶] And when he was sitting here when you guys were picking jurors, he was writing all kinds of bizarre stuff and saying -- you know, when they picked him and he was sworn in, he was, like, I made it. And he's just -- he's not in his right mind. [¶] And I personally can't sit there and just -- I can't argue with -- I mean, I can't even -- he's not rational. I can't do it. And I can't -- I want to do the right thing and -- I don't know how long this is going to go. I've got to pay my bills. I've got to do things, and this guy is enjoying this. He's enjoying antagonizing me. [¶] I really believe that he has a mental problem and he's not using his common sense. And everybody -- if you would bring everybody in, and I would beg you to do that, they

11

would all say the same thing. [¶] . . . [¶] And he didn't tell you that he brought up an incident -- when you asked us if we had certain issues from the past, he told us that he got -- he was -- some guy attempted to shoot him in the foot when he was younger. [¶] He had an incident he didn't tell you about, any of you guys about. He didn't share that with you, and I think that he has a bias. I mean, I think that's important. And we all -- when you asked us questions, we gave you our correct answers to the questions and we told you what happened in our past. He didn't tell you that." Juror No. 10 also stated Juror No. 9 was playing Sudoku "during the testimony" in the trial.

The trial court then brought Juror No. 9 back in for questioning concerning Juror No. 10's allegations of his "not sharing something that he would have been obligated to share [during voir dire] and not paying attention during the testimony, playing games." With respect to his failure to disclose the shooting incident, Juror No. 9 explained he was shot in the foot during the burglary incident he did disclose in voir dire. He elaborated: "It was a home invasion robbery. Well, I don't know if I -- somebody broke into my house. I was taking a nap. Guy woke me up. At the same time he heard my parents coming in the door, so he gathered us all up and he had a gun and he shot down at the ground to scare me and then that bullet didn't go off at all. And I challenged him and he shot at me again at my foot." The trial court asked: "And when he shot at you, it actually hit your foot?" Juror No. 9 responded: "Yeah." The trial court asked: "So you had a gunshot wound in the foot?" Juror No. 9 answered: "Yes." Juror No. 9 also explained that while the perpetrator was "wearing a mask," he believed the man "looked like an African American," and added: "I lived in inner city Detroit." With respect to playing Sudoku, Juror No. 9 denied playing the game during trial, but admitted he "[m]ay have" played during jury selection.

Juror No. 11 was then questioned and confirmed he observed Juror No. 9 playing Sudoku during the first or second day of trial, but did not know whether witnesses were testifying at the time.

After Juror No. 11 exited the courtroom, the trial court stated that what Juror No. 9 revealed during voir dire (i.e., that his "parents were victims of burglary a long, long time ago" and he "was witness to that") is "quite different than being the victim of a home invasion where he's actually shot." The trial court also found Juror No. 11's statement regarding the Sudoku incident to be credible.

The prosecutor asked that Juror No. 9 be removed from the jury and argued: "When we questioned him about the home invasion that . . . I am positive he did not mention during voir dire. He at first seemed nervous and then he seemed more emotional when he began to discuss the portions of the incident more specifically, being woken up, being assaulted with the firearm. [¶] Also, when the Court asked him about the race of the perpetrator, he hesitated and then said that the -- the person was wearing a mask, but he could tell that that person was African American and then made a comment about living in inner city Detroit. [¶] . . . [M]y concern would be that [Juror No. 9] harbors some ill [will] towards African Americans because of the fact that he was the victim of a home invasion robbery perpetrated by what he believed to be an African American male. [¶] And because of that, and the representations about him playing Sudoku when [Adcock], I guess, would have been on the stand when we first began, according to [Juror No. 11]. Based upon that and the other issues, not paying attention, I'd ask he be excused." Defense counsel objected to Juror No. 9's removal and pointed out the importance of the trial court's decision, "especially with [Juror No. 9's] comment being an unsolicited comment -- he shouldn't have made it maybe -- that he's the lone holdout on a number of counts."

13

The trial court responded: "The Court absolutely appreciates that, but I would say for the record's purposes that I'm specifically not making any determinations based on that part of his representation because from my standpoint, that's not an issue that I wanted to know, need to know. [¶] I have to make the determination absolutely putting that aside and just looking and saying, you know, what do I have in front of me? And what I have is somebody who now it looks like there's pretty good evidence that he wasn't candid with the Court over all the things that he's witnessed. [¶] You know, to say, you know, he witnessed that burglary and it really wasn't a burglary, it was a home invasion, at least he would have told us he was shot or that there was a gun being used. [¶] The Court thinks that I asked at some point the generic question of whether, you know, people had been shot at. I may not have asked every witness -- or every potential juror, but for [Juror No. 9] to miss the import of, you know, hey, this is something that counsel and the Court would have wanted to have them told and to say, hey, you can respond that there's no concern over it and my follow up would have been looking at his questionnaire to start with, which had the specific representation that he was not a personal witness to something, you know, would have downplayed my inquiry, just like it happened and say, no, this is just something that's come up because somebody else mentioned a burglary. [¶] That's not what this person now has said they had happen and that causes the Court great concern if then the scenario is the person writes so that another juror can see it, you know, I made it. [¶] And the inference is, yes, there is potential bias that's inferred from that, just the failure to disclose and writing after that failure to disclose 'I made it' and then the actions being that he's playing Sudoku at the beginning of the trial when we had the African American victim. [¶] So from the Court's standpoint, the Court will, even over the defense objection here, excuse [Juror No. 9]."

**B.**

*Analysis*

Section 1089 gives the trial court the authority to discharge a juror who, upon good cause shown, is found to be unable to perform his or her duty. Because "[a] juror's duty is to weigh the evidence and credibility of witnesses with impartiality and to reach a fair and unbiased verdict," a finding of "actual bias, which would have supported a challenge for cause, renders [the juror] 'unable to perform his [or her] duty' and thus subject to discharge and substitution" under section 1089. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484.) "The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, ' "does not offend constitutional proscriptions." ' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 820-821 (*Wilson*).) However, in order to protect a defendant's constitutional rights to due process and to a fair trial by an unbiased jury, "a juror's inability to perform as a juror must be shown as a 'demonstrable reality.'" (*Id.* at p. 821; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

A potential juror's intentional concealment of material information during the voir dire examination may constitute implied bias justifying removal. (*Wilson*, *supra*, 44 Cal.4th at p. 823; *People v. McPeters* (1992) 2 Cal.4th 1148, 1175 (*McPeters*), superseded by statute on another point as stated in *People v. Wallace* (2008) 44 Cal.4th 1032, 1087; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 644.) However, "mere inadvertent or unintentional failures to disclose are not accorded the same effect. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under [section 1089] that [the juror] is unable to perform his [or her] duty.'" (*McPeters*, *supra*, 2 Cal.4th at

15

p. 1175.) "Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court." (*Ibid*.)

In *People v. Diaz* (1984) 152 Cal.App.3d 926 (*Diaz*), the Court of Appeal held that the trial court prejudicially abused its discretion in not discharging a juror upon learning the juror concealed during voir dire that she had been a victim of the same crime with which the defendant was charged, i.e., assault with a deadly weapon. The court explained that "the juror's failure to correctly respond to voir dire questions having a substantial likelihood to disclose facts showing a strong potential for juror bias prevented [the defendant] from intelligently inquiring into an area of potential bias upon which to base a challenge for cause or to knowingly exercise one of his remaining peremptory challenges." (*Id*. at p. 930.) Aside from pointing out that "[a] juror's misconduct is good cause which, under the provisions of either section 1089 or [former section] 1123, may permit the [trial] court to replace him or her with an alternate" (*id*. at p. 934), the court explained that "'[t]he peremptory challenge is a critical safeguard of the right to a fair trial before an impartial jury . . . .' [Citation.]" (*Id*. at p. 932.) "Where a party has examined the jurors concerning their qualifications during voir dire and any of them have failed to respond truthfully, ' "it is manifest that he [or she has been] deprived of his [or her] right to challenge for cause, and [has been] deceived into foregoing his [or her] right of peremptory challenge."' [Citation.] Any particular manner in which a jury is impaneled which ' "prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." ' [Citations.]" (*Id*. at pp. 932-933.)

Here, as was the case in *Diaz, supra*, 152 Cal.App.3d 926, Juror No. 9's concealment of the fact that he was the victim of an assault with a deadly weapon constitutes misconduct and good cause for his discharge from the jury. Juror No. 9 was directly asked on his juror questionnaire whether "[he], a close friend or relative [had]

ever been a victim of crime." As in *Diaz,* this question was "relevant to [the] voir dire examination, unambiguous in character, and pertained to matters about which [Juror No. 9] had substantial knowledge of the information sought to be elicited." (*Id*. at p. 936.) As mentioned, Juror No. 9 initially answered, "No." He amended his response during voir dire to reveal his "parents were victims of burglary a long, long time ago," and he "was witness to that." However, during deliberations, he revealed to his fellow jurors he was not simply a witness to his parents having their house burglarized. He was home when the burglary occurred and was shot in the foot by the perpetrator. Despite the fact Juror No. 9 was aware he could amend his previous response to reveal these facts, and despite the fact he witnessed one prospective juror removed after revealing his mother was attacked during a burglary and two other prospective jurors removed after recounting shooting incidents, Juror No. 9 did not amend his previous response to reveal what he later shared with his fellow jurors, i.e., *he* was the victim of an assault with a firearm during the burglary. Moreover, when Juror No. 9 was selected as one of the jurors, he stated: "I made it." From these facts, the trial court was justified in concluding Juror No. 9's concealment of the shooting was intentional. Such intentional concealment of material information may constitute implied bias justifying removal. (*Wilson*, *supra*, 44 Cal.4th at p. 823.) The trial court's removal of Juror No. 9 from the jury violated neither section 1089 nor defendant's constitutional rights.[2]

---

[2]    While we disagree with the Court of Appeal's statement in *Diaz*, *supra*, 152 Cal.App.3d 926 that concealment "constitutes juror misconduct giving rise to a presumption of prejudice regardless whether nondisclosure was unintentional and based upon a good-faith misunderstanding of the meaning of the question posed" (*id*. at p. 938; see *People v. Jackson* (1985) 168 Cal.App.3d 700, 705), we believe that where, as here, the question propounded is relevant to the voir dire examination and is unambiguous, and where the juror has substantial knowledge of the information sought to be elicited, the trial court may appropriately conclude the concealment was intentional, giving rise to a

17

While *Diaz*, *supra*, 152 Cal.App.3d 926 involved the situation in which the trial court prejudicially abused its discretion by failing to discharge the juror in question, the People have the same right as a criminal defendant to challenge jurors for cause and to the use of peremptory challenges to obtain an impartial jury drawn from a fair cross-section of the community. (Code Civ. Proc., §§ 225, 231; see also *People v. Garcia* (2011) 52 Cal.4th 706, 746, fn. 23.) Where, as here, it would have been an abuse of discretion not to discharge Juror No. 9 had defendant requested his removal, it would defy logic to hold the removal of the same juror upon the prosecution's request amounted to an abuse of discretion.

Defendant's reliance on *Wilson*, *supra*, 44 Cal.4th 758 and *Sanders v. Lamarque* (9th Cir. 2004) 357 F.3d 943 (*Sanders*) is misplaced. In *Wilson*, a juror was removed during the penalty phase of a capital murder trial. He was the sole juror voting for life imprisonment, and made a number of comments concerning race during penalty phase deliberations, including: " 'I don't expect you to understand; you're not black.' 'Black people don't admit being abused.' 'Black kids have a different relationship with their fathers.' " (*Id*. at p. 818.) The trial court found he " 'concealed his racial biases and fundamental belief in racial stereotypes on voir dire.' " (*Id*. at p. 819.) Our Supreme Court disagreed: "The record fails to demonstrate that [the juror] concealed anything. He was never asked whether he would interpret evidence of any abuse defendant may have suffered as a child through the prism of his own experiences; indeed, we expect jurors to use their own life experiences when evaluating the evidence. [Citation.]" (*Id*. at p. 823.) While the juror affirmed during voir dire that "he would not consider defendant's race to benefit or disadvantage him and that he would treat him like he would

rebuttable presumption of prejudice. (See *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929-930.)

anyone else," he explained during the penalty phase that "he viewed the mitigating evidence favorably because defendant came from a broken, disadvantaged family, not simply because he was African-American." (*Ibid*.) And while the trial court "apparently concluded that [the juror] had concealed certain race-based assumptions regarding the nature of family dynamics in African-American families, especially with regard to young men who grow up without strong positive male role models," he was not asked about that subject during voir dire, and the "failure to express his views about African-American family dynamics is not the kind of concealment that would justify [his] removal from the jury under section 1089, i.e., something showing 'good cause' he was '*unable* to perform his . . . duty [as a juror].' " (*Id*. at pp. 823-824.)

In *Sanders*, *supra*, 357 F.3d 943, a juror was removed because the trial court erroneously concluded she failed to disclose that her sons claimed gang affiliation, and she lived in a neighborhood where there was open gang activity. In reality, the juror "answered questions about her sons' activities in detail and did not, in fact, live 'in a neighborhood where apparently there was . . . gang activity going on.' " (*Id*. at pp. 947-949.)

Here, as mentioned, Juror No. 9 was directly asked whether "[he], a close friend or relative [had] ever been a victim of crime." While he revealed his parents had their house burglarized, he omitted that he was the victim of an assault with a firearm during the burglary. Substantial evidence supports the trial court's conclusion that his concealment of this fact was intentional.

We conclude the trial court did not violate section 1089 or violate defendant's constitutional rights by removing Juror No. 9 for intentional concealment of material information during voir dire.

19

### *Heightened Security Measures*

Defendant also claims the trial court prejudicially abused its discretion by ordering a sheriff's deputy to stand near him during his testimony based on a standing practice in the Sacramento County Superior Court rather than a case-specific analysis that balanced the need for heightened security against the danger of prejudice to defendant's case. This claim has been forfeited by defendant's failure to object to the heightened security measures. (See *People v. Majors* (1998) 18 Cal.4th 385, 406 [failure to object to security measures taken at trial forfeits claim on appeal]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [same].)

In any event, even if the issue were preserved, we find no prejudice. In *People v. Hernandez* (2011) 51 Cal.4th 733 (*Hernandez*), our Supreme Court held the trial court erred by stationing a deputy at the witness stand during the defendant's testimony based on a general policy rather than a case-specific determination as to whether such heightened security was appropriate. The court first explained that, unlike visible physical restraints, "a security officer's presence near a testifying defendant is *not* inherently prejudicial. [Citation.] . . . '[S]o long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings.' [Citation.]" (*Id.* at p. 742.) Nevertheless, " 'the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy.' [Citation.]" (*Ibid.*) Additionally, the trial court " 'should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the

defendant's custodial status.  [Citations.]' " (*Id.* at p. 743, quoting *People v. Stevens* (2009) 47 Cal.4th 625, 642.)  Finding the trial court did not engage in the required "case-specific consideration of the need for heightened security, or of the potential prejudice that might result," our Supreme Court held the error to have been harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818.  (*Hernandez*, *supra*, 51 Cal.4th at pp. 743-747.)

Assuming the trial court in this case erred under *Hernandez*, the error was harmless.  As was the case in *Hernandez*, "it is not reasonably probable that defendant would have obtained a more favorable result absent the [assumed] error.  Defendant was monitored by a single deputy, and, as in [*People v. Stevens*, *supra*, 47 Cal.4th 625], nothing in the record suggests that this deputy's demeanor was anything other than respectful and appropriate." (*Hernandez*, *supra*, 51 Cal.4th at p. 746.)  Indeed, when defendant initially took the stand, the trial court was careful about positioning the deputy outside the direct line of sight of the jury.  As defense counsel described the deputy's position, "[s]he's standing, not sitting, but standing probably five feet, would be my estimate, [from defendant] -- as I'm looking at [defendant] on the witness stand [that] would be [defendant's] left, obviously to his right as he sits."  The following day, a different deputy was positioned near defendant as he testified.  The trial court stated this deputy "for most of the day was seated out of sight of the jury while the defendant was testifying so that there was no -- not only not in the line of sight, but for most of the time completely out of sight of the jury."  Based on the record in this case, we are confident the deputies maintained a respectful distance from defendant and did not behave in a manner that distracted from or appeared to comment on his testimony.

Also like *Hernandez*, the evidence against defendant was strong.  Indeed, he admitted to each of the shooting incidents.  Nevertheless, defendant argues his "testimony

21

and credibility were crucial to convincing the jury he did not have the intent to kill for the attempted murder counts." However, *Hernandez* also involved a situation in which the defendant's state of mind was at issue, i.e., whether the defendant reasonably believed in the need to defend himself from imminent harm. The defendant there also claimed that " 'the result necessarily depended on the jury's evaluation of the credibility of [the defendant] versus that of [the victim].' " (*Hernandez*, *supra*, 51 Cal.4th at p. 746.) Similarly, here, the jury had to weigh the credibility of defendant versus that of the alleged victims. "But this aspect of the case is not unique. 'In nearly every case when an accused testifies in his [or her] own defense, the jury will have to weigh the credibility of the defendant and the alleged victim.' [Citation.]" (*Ibid.*) We find no reasonable probability that, without the presence of a deputy near the witness stand, the jury would have believed defendant's testimony that he did not intend to kill the victims when he fired multiple rounds into the sides of their vehicles while driving on the freeway under the influence of alcohol and cocaine.

Finally, in *Hernandez*, our Supreme Court found the error to be harmless despite the fact that the trial court refused the defendant's request that the jury be instructed to disregard his custodial status. (*Hernandez*, *supra*, 51 Cal.4th at p. 740.) Here, such an instruction was given to the jury. "We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17; *People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

In sum, defendant has forfeited his claim that the trial court erred by stationing a deputy near the witness stand during his testimony based on a general policy rather than a case-specific determination as to whether such heightened security was appropriate. And

even if the issue were preserved, there is no reasonable probability defendant would have received a more favorable outcome in the absence of such security measures.

### III

### *Booking Fee*

Finally, by failing to object to the trial court's imposition of the booking fee, defendant has forfeited the ability to challenge the sufficiency of the evidence to support this fee on appeal.  (*People v. McCullough* (2013) 56 Cal.4th 589, 590 [a defendant who fails to contest the booking fee when the trial court imposes it forfeits the right to challenge the sufficiency of the evidence to support the fee], disapproving of *People v. Pacheco* (2010) 187 Cal.App.4th 1392 [holding defendant's failure to object to imposition of a booking fee does not forfeit an appellate challenge based on insufficiency of the evidence].)

### DISPOSITION

The judgment is affirmed.

                                           HOCH    , J.

We concur:

      BLEASE    , Acting P. J.

      BUTZ      , J.